UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


DAN FLYNN, AMBER FLYNN,

        Plaintiffs,

v.                                                                        Case No. 05-CV-73850

OAKLAND COUNTY, MICHAEL BOUCHARD           HONORABLE AVERN COHN
MICHAEL MCCABE, DAMON SHIELDS,
DOUGLAS MOLINAR, GORDON PIZZINI,
CLAY JANNSON, MARK VENUS, MARTIN BAY,
JAMES AHEARN

        Defendants.

_____/


**MEMORANDUM AND ORDER GRANTING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

### I. Introduction

      This is a civil rights case under 42 U.S.C. § 1983. Boiled down, Plaintiff Dan Flynn, a former Oakland County Deputy Sheriff,[1] claims he was retaliated against for anonymously sending an e-mail message to the Oakland County Sheriff describing improper conduct that occurred at a party attended by employees of the Oakland County Sheriff's Office. Additionally, Flynn claims that Oakland County has a policy or custom of allowing retaliatory actions against county employees who report wrongdoing by other county employees.

_____

      [1] Since the filing of the present motion, Flynn has been terminated from his employment with the Oakland County Sheriff's Office effective March 20, 2009. Flynn has filed a Motion for Leave to File a Third Amended Complaint, in which he seeks to add a retaliatory discharge claim under the First and Fourteenth Amendments to the United States Constitution. The Court has entered an order staying action on Flynn's motion for leave pending the Court's disposition of the present motion. See Dkt. 103.

Flynn is suing (1) Oakland County, (2) Oakland County Sheriff Michael Bouchard, (3) Oakland County Undersheriff Michael McCabe, (4) Major Damon Shields, (5) Captain Douglas Molinar, (6) Lieutenant Gordon Pizzini, (7) Sergeant Clay Jannson, (8) Sergeant Mark Venus, (9) Deputy Sheriff Martin Bay, and (10) Lieutenant James Ahearn.

Flynn's Second Amended Complaint ("SAC") contains the following claims: (1) First Amendment Retaliation, (2) Constitutional Violations by Oakland County, (3) Violations of Title VII of the Civil Rights Act of 1964, (4) Violations of the Fourth Amendment, (5) Violation of Michigan's Elliot Larsen Civil Rights Act, (6) False arrest and false imprisonment, (7) Assault and battery, and (8) Loss of consortium.[2]  All of these claims except the first two were effectively withdrawn by Flynn on the record at oral argument on May 26, 2009.  See Hr'g Tr. 22-23.

Now before the Court is Defendants' Motion for Summary Judgment.  For the reasons that follow, the motion will be granted.

## II. Background

### A.

The background of this case is largely undisputed.  Flynn began working for the Oakland County Sheriff's Office as a Deputy I in 1990.  In 1991, he was promoted to a Deputy II and has remained in that position since that time.

On February 28, 2004, a birthday party was held in honor of Oakland County Sheriff Deputy Russ Sherman.  The party was planned by Deputy Sherman's wife and was held in a private room inside the Elephant Bar in Commerce Township, Michigan.  The party was attended by employees from the Oakland County Sheriff's Department, the Commerce

---

[2] The loss of consortium claim is brought by Flynn's wife.

2

Township Fire Department, and the Walled Lake Public Schools.  Alcohol was served. Neither Flynn nor his wife attended the party.

Deputy Sherman's wife hired a stripper to perform at the birthday party.  During the course of the evening, a stripper danced nude for the guests, performed a "lap dance" for Deputy Sherman, and performed what the parties have called a "sex toy show" involving a "penis replica."

Flynn became aware of the details of the party in March 2004.  Specifically, Flynn learned that women had purportedly been sexually harassed by Oakland County Sheriff deputies, and that possible prostitution and liquor control violations had occurred in the presence of the general public and Oakland County Sheriff deputies.  At the time, Flynn was stationed at the Commerce Substation.  As soon as Flynn became aware of these events, he notified his station commander, Sergeant Venus, of deputies' possible involvement.  When Sergeant Venus failed to take action, Flynn attempted to notify Sheriff Bouchard via an anonymous e-mail.  After Flynn's first attempt to send the e-mail failed, another e-mail was sent by Flynn's wife.  The e-mail to Sheriff Bouchard reads, in its entirety, as follows:

> Mr. Bouchard, I would like to bring to your attention a [sic] incident that occurred in Commere Township, at the Elephant bar.  One of your officers- Russell Sherman -had a party a few months ago and a stripping dancer came.  The Officer performed graphic sex acts on her in front of other Police men, Citizens and Walled Lake School Staff. School stafff [sic] are shocked by this behavior, seeing that Russell is a school officer.  This situation needs to be dealt with.
> Anonymous

Although the identity of the sender of the e-mail remained secret in the days immediately following its transmission, Flynn was subsequently identified as the sender.

**B.**

3

Flynn claims that he was subjected to constant retaliation and mistreatment by his co-workers and superiors for sending the e-mail to Sheriff Bouchard. According to Flynn, Sergeant Venus revealed that Flynn was the sender of the e-mail despite an order to keep the matter confidential among certain supervisory officials. Flynn also says that he was told by Deputy Todd Wood that Sergeant Venus told "[e]veryone at the station" that they should "take [Flynn] out and beat the fuck out of [him]" for sending the e-mail to Sheriff Bouchard. Flynn Dep. at p. 86. An investigation into the incident was conducted by Lieutenant Davis. In his deposition, Flynn acknowledged the result of the investigation: "not a single individual admitted that Venus made that statement." Id. at pp. 127-128. Flynn claims that "[s]omebody's lying." Id. at p. 128

On August 1, 2004, Flynn was ordered to the Special Investigations Unit to give a compelled statement regarding his knowledge of the events surrounding the Elephant Bar incident. Flynn says that he was denied a union representative. Defendants say that Flynn acknowledged his right to have counsel present but failed to make any such request. In his deposition, Flynn testified that he "didn't ask for [representation]." Id. at p. 189. Flynn further testified that Sergeant Jansson called him a "coward" during the interview and told him that his "career is over." Id. at p. 97.

Effective August 21, 2004, Flynn was transferred from his assignment at the Commerce Substation to Complex CRT.[3] Although Flynn testified that he requested a transfer, he asserts that his transfer to Complex CRT was a "humiliation tactic" because "whenever anybody does something wrong or perceived wrong, Command will transfer them and everyone will know they did something wrong." Id. at pp. 114-116. Flynn admits

---

[3] Complex CRT is not defined in the parties' papers.

4

that the transfer was a "lateral" one and that he received no reduction in benefits or pay. Id. at pp. 114-115.

Effective September 18, 2004, Flynn was transferred again, this time from Complex CRT to Lyon Contract.[4] Id. at pp 117-118.  Flynn claims that this transfer, like the first one, was retaliatory.  According to Flynn, the transfer to Lyon Contract was a "humiliation tactic" because "they put him with [Deputy] Bay," who "doesn't like anyone who reports thing[s] to bosses."  Id.  However, Flynn testified that he "got along fine" with Deputy Bay at the time of the transfer.  Id.

While at Lyon Contract, Sergeant Crocket, who is not a defendant, told Deputy Bay that he did not have to "break bread" with Flynn.  Bay Dep. at p. 26.  Flynn says that Sergeant Crocket held a substation meeting in which he announced the same to all the deputies present.  Flynn Dep. at p. 191.

Additionally, while at Lyon Contract, someone put a "Trust No One" sticker on Flynn's car and a "Who's a Rat" printout in his employee mailbox.  Id. at p. 142.  Flynn acknowledges that Deputy Bisio was interviewed about this incident.  Id.  The person or persons responsible have not been identified.

Thereafter, someone broke into Flynn's employee locker and took personal items. Id. at p. 133.  Flynn admits that this incident was investigated by Sergeant Crocket.  Id. at pp. 133-134.  The person or persons responsible for this incident have not been identified.

Flynn claims that he was assaulted by Deputy Bay on December 15, 2004.  Id. at p. 123.  This incident was investigated by Sergeant Crocket, who prepared a written report regarding his investigation.  See Defs.' Ex. I.  Sergeant Crocket interviewed Flynn and Bay,

---

[4] Lyon Contract is not defined in the parties' papers.

5

along with eyewitnesses to the incident, and determined that Flynn and Bay "were both on equal terms" and "[n]either seemed more aggressive that [sic] the other." Id. Sergeant Crocket concluded that Flynn's assault claim was "unfounded." Id.

Next, Flynn claims that he was retaliated against when he received his first ever negative performance evaluation in 2005. Flynn Dep. at p. 172. Flynn's previous eight performance evaluations covering years 1997 through 2004 contained only positive remarks and ratings of either "outstanding" or "above average." See Pls.' Ex. AA. His 2005 evaluation, however, stated that Flynn "needs to improve his cooperation with supervision and fellow employees" and contained six "above average" ratings and two "average" ratings. See id. at Ex. FF.

Finally, Flynn says that Deputy Bay failed to back him up in the field until Flynn had already secured a potentially dangerous situation. See Flynn Dep. at pp. 135-137. Specifically, Flynn claims that Deputy Bay purposefully responded too slowly to his call for backup. According to Flynn, "[Deputy Bay] was about two to three miles away from me when I called this out, and he continued in the opposite direction." Id. at p. 135. An internal investigation was conducted regarding this incident, which Flynn acknowledged during his deposition. See id.; Defs.' Ex. K.

Following this last incident involving Deputy Bay, Flynn's physician temporarily took him off work for "[a] couple weeks" for acute work related stress. Flynn Dep. at pp. 175-176.

### III.  Summary Judgment Standard

The standard for summary judgment is well known and does not bear repeating here.

6

## IV.  Analysis

### A.  Flynn's First Amendment Retaliation Claim

Flynn's SAC does not state which of the defendants he says violated his First Amendment rights.  However, the chart contained in a supplemental filing, see Dkt. 91, notes that Flynn's First Amendment retaliation claim is brought against the following eight defendants: Bouchard, McCabe, Shields, Molinar, Pizzini, Jannson, Venus, and Ahearn.

### 1. First Amendment Retaliation Claims, Generally

As stated by the Sixth Circuit,

> [i]n order for an employee to establish a claim of First Amendment retaliation, the employee must demonstrate that: (1) he engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two-that is, the adverse action was motivated at least in part by his protected conduct.

Scarbrough v. Morgan County Bd. of Educ., 470 F.3d 250, 255 (6th Cir. 2006).  The Court does not discuss elements one and three because, for the reasons discussed below, it finds that Flynn did not suffer an adverse employment action.

### 2.  Flynn's Position

Flynn claims that he suffered adverse employment action in the form of (1) two involuntary transfers, (2) the denial of promotional opportunities and overtime, and (3) a negative performance evaluation.

### a.  The Transfers

Notification of Flynn's first transfer came approximately one month after he sent the anonymous e-mail to Defendant Bouchard.  On August 15, 2004, Flynn was notified via Administrative Order 04-PS-rd-035, which was signed by Captain Molinar, that he and 22

other deputies would receive a new assignment effective August 21, 2004.  See Defs.'
Reply at Ex. A.  The portion of this Administrative Order pertaining to Flynn reads: "Deputy
D. Flynn from Commerce Contract 0700-1500 hours to Complex CRT 0700-1500 hours
with Monday/Tuesday leave days."  Id.  Flynn testified that his transfer to this location was
a "humiliation tactic" and therefore constituted an adverse employment action.  Flynn Dep.
at p. 114.  According to Flynn, "whenever anybody does something wrong or perceived
wrong, Command will transfer them and everyone will know they did something wrong.  It
was common practice." Id. at p. 115.  Flynn further testified that the transfer was a "lateral"
one and that he did not receive any reduction in benefits or pay as a result of the transfer.
See id. at pp. 114-115.  Flynn cites Burlington Northern and Santa Fe Ry. Co. v. White, 548
U.S. 53, 71 (2006), for the proposition that a transfer to a less appealing job even with the
same pay constitutes an adverse employment action.

   Flynn was transferred once again effective September 18, 2004.  Flynn was notified
of the transfer via Administrative Order 04-PS-rd-036, which is dated August 25, 2004, and
signed by Captain Molinar.  This time, Flynn was one of 40 deputies receiving a new
assignment pursuant to the "semi-annual bump."  See Defs.' Reply at Ex. B.  The portion
of Administrative Order 04-PS-rd-036 pertaining to Flynn reads: "Deputy D. Flynn from
Commerce CRT 0700-1500 hours to Lyon Contract 0700-1500 hours with Monday/Tuesday
leave days."  Id.  Flynn believes that his transfer to Lyon Contract constitutes adverse
employment action because he was forced to work with Deputy Bay, who "doesn't like
anyone who reports thing[s] to bosses."  Flynn Dep. at pp. 117-118.  Flynn states in his
deposition, however, that he and Deputy Bay "got along fine" at the time of the transfer.
Id. at p. 117.

### b.  The Denial of Promotional Opportunities and Overtime

Flynn devotes a mere two sentences to this particular claim in his brief.  Those two sentences read as follows: "In addition to the repeated harassment, Plaintiff was denied promotional opportunities and overtime.  Captain Molinar even testified that he would never recommend [Flynn] for a sergeant position after he reported the officer misconduct."  Pls.' Resp. to Defs.' Mot. for Summ. J. at 17 (citations omitted).   Flynn relies on his own deposition testimony and that of Captain Molinar in support of these statements.   The relevant portions of Flynn's testimony are as follows:

> A.    They made it so stressful for me that I find it difficult to work anymore overtime.
>
> Q:    So stress has resulted in you not working overtime?
>
> A:    Yes.
>
> * * * *
>
> Q:    Do you believe that you would have obtained promotions?
>
> A:    Yes.
>
> Q:    Why is that?
>
> A:    Venus gave me all the sergeant material.  Lieutenant Davis, . . . Captain Johnson, [and] Lieutenant Sutton all helped me to prepare for testing for sergeant.
>
> Q:    Was this before or after the Elephant Bar?
>
> A:    Before.
>
> Q:    Okay.  And after that what happened with regards to –
>
> A:    I just – I'm not – I'm not eligible, I know that.

Flynn Dep. at pp. 200, 210.  The relevant portions of Captain Molinar's testimony are as follows:

Q:    How about sergeant's position, would you have recommended
      [Flynn] a promotion to sergeant?

A.    No.

Q:    Why not?

A:    Because he had a lot of issues where he in my opinion did not
      make good decisions.  Prior to the Elephant Bar, prior to him
      not being able to handle the duties of a detective, he did a very
      good job.  He was a very good officer.  Back then he was
      officer of the year.  He has a lot of potential, but then he just
      found out he couldn't handle the stress that goes with it, the
      additional duties of a commander, of having to take care of not
      only yourself but other persons at a substation, and I don't
      think he could handle the stress and other duties that would be
      required of a commander.

Molinar Dep. at p. 69.

### c.  The Negative Performance Evaluation

In March 2005, Flynn received a performance evaluation stating that "[h]e needs to improve his cooperation with supervision and fellow employees."  Pls.' Ex. FF.  The evaluation is signed by Defendants Crockett, Pizzini, Molinar, Shields, and McCabe.  Flynn claims that this negative evaluation constitutes adverse employment action and cites one case, Dzierbicki v. Township of Oscoda, No. 07-13109 (E.D. Mich. Dec. 17, 2008) (unpublished), in support of his position.

### 3.  Defendants' Response

### a.  The Transfers

First, Defendants argue that lateral transfers without a reduction in pay or benefits do not constitute adverse employment action.  However, Defendants cite no authority in support of that position.

Defendants next argue that Flynn's transfers "are completely unrelated to Plaintiff

10

or his claims in this matter." Defs. Reply at 1. Defendants point out that Flynn was one of 23 employees who were transferred effective August 21, 2004, and one of 40 deputies who were transferred effective September 18, 2004. According to Defendants, "Plaintiff's claim that his assignment to CRT Complex constitutes retaliation fails because he was treated no differently then [sic] the other 22 deputies who were reassigned effective August 21, 2004." Id. at 2. Defendants assert the same argument with respect to the September 18, 2004, transfer: "This move cannot support a claim of retaliation when Plaintiff was one of 40 employees changing location." Id.

### b. The Denial of Promotional Opportunities and Overtime

Defendants say that Flynn has "blatant[ly] misrepresent[ed]" Captain Molinar's deposition testimony and that Flynn's claim that he has been denied a promotional opportunity is "completely unfounded." Id. at 3-4. According to Defendants,

> Capt. Molinar testified that he would not recommend Plaintiff for a detective position or a position with the Fugitive Apprehension Team because Plaintiff was unable to handle the duties of an investigator at Commerce. In Molinar's opinion, Plaintiff was burned out as a detective and he could not handle the stress of being responsible for others in a command position.

Id. at 3. Moreover, Defendants cite the following testimony from Captain Molinar's deposition and state that "Capt. Molinar has never been asked for his input regarding a sergeant's position."

> Q:   So without your recommendation, [Flynn] would never have been considered for any of these promotions, correct?
>
> A:   That's not true at all. Sergeant is a competitive test, and the competitive test would be based on your results. It's given through personnel, and based on the results of that, the sheriff's office gets the top three or top five candidates, and then it's sent to the sheriff to make that decision.

11

Q:      And the sheriff makes the decision based upon recommendations from some of the other command staff?

A:      Sometimes, not always.

Q:      So if Dan Flynn had been one of the top three to five candidates and the sheriff's office had to score one of the top three candidates, would they have solicited your recommendations?

A:      I don't know what he would have done.  I can't speak for the sheriff.

Q:      Has he done that in the past, asked for input on –

A:      Not on the sergeant's level, no.

Q:      What type of recommendations does he ask you for when it involves promotions?

* * * *

A:      Sheriff's, he's asked for input on captains.  He's asked for input on lieutenants, but I don't recall him asking for input on sergeant level.

Molinar Dep. at pp. 69-70.

### c.  The Negative Performance Evaluation

Defendants assert that a negative performance evaluation is not an adverse employment action.  Although Defendants cite no authority in support of that position, they argue that the authority on which Flynn relies, namely, Dzierbicki, "in no way supports" Flynn's position.

### 4.  Law

An adverse employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  Burlington Indus.,

12

Inc. v. Ellerth, 524 U.S. 742, 761 (1998).  See also Thaddeus-X v. Blatter, 175 F.3d 378, 396 (6th Cir. 1999) (examples of adverse employment action "include discharge, demotions, refusal to hire, nonrenewal of contracts, and failure to promote").  Actionable employer retaliation is that which is "materially adverse to a reasonable employee." White, 548 U.S. at 57.  In other words, "the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination."  Id.[5]

Failure to promote is an example of an adverse employment action.  See Ellerth, 524 U.S. at 761.  A plaintiff asserting a failure to promote claim

must demonstrate that (1) she is a member of a protected class; (2)

_____

[5] White, which involved a claim under Title VII's anti-retaliation provision, see 42 U.S.C. § 2000e-3(a), and not a First Amendment retaliation claim, resolved a circuit-split regarding the reach of the phrase "discriminate against," concluding that the more relaxed standard is appropriate.  See White, 548 U.S. at 57 ("[w]e conclude that the anti-retaliation provision does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace").  There is some question as to whether the relaxed standard articulated by the White Court applies in the context of a First Amendment retaliation claim.  See, e.g., Blackwell v. Laque, 275 Fed. App'x 363, 370 n.8 (5th Cir. 2008) ("[w]e need not decide whether the adverse employment action standard articulated in Burlington Northern & Santa Fe Railway Co. v. White applies to First Amendment retaliation cases").  The parties here have not addressed the issue in their briefs.  Although the Sixth Circuit has not yet addressed the issue, several courts have determined that White applies in the context of a First Amendment claim, see, e.g., Laredo Fraternal Order of Police v. City of Laredo, Tex., No. L-04-134, 2008 WL 678698, at *2 (Mar. 12, 2008 S.D. Tex); Tatroe v. Cobb County, Ga., No. 04-CV-1074, 2008 WL 361010, at *6 (N.D. Ga. Feb 8, 2008); Sharp v. City of Palatka, 529 F. Supp.2d 1371, 1375-1376 (M.D. Fla. 2006), and the Court is unable to locate any case in which a court has declined to apply the White standard to a First Amendment retaliation claim.
While the Court believes that the White standard probably applies to First Amendment retaliation claims for the reasons stated in Tatroe and Sharp, the present case provides the Court with no occasion to address this question because Flynn fails to raise a genuine issue of material fact as to whether the actions taken against him constitute adverse employment actions under even the more generous standard articulated by the White Court.

she applied for and was qualified for a promotion; (3) she was
considered for and was denied the promotion; and (4) an individual of
similar qualifications who was not a member of the protected class
received the job at the time plaintiff's request for the promotion was
denied.

White v. Columbus Metro. Hous. Auth., 429 F.3d 232, 240 (6th Cir. 2005).  Moreover, "the

denial of overtime can constitute an adverse employment action."  Broska v. Henderson,

70 Fed. App'x 262, 267 (6th Cir. 2003) (unpublished).  However, in order to survive

summary judgment, the plaintiff must "produce[] evidence sufficient to raise a genuine issue

of material fact as to whether he was denied overtime opportunities."  Id. at 268.

Additionally, the Sixth Circuit has held that "[i]n general, 'a negative performance

evaluation does not constitute an adverse employment action unless the evaluation has an

adverse impact on an employee's wages or salary.'"  White v. Baxter Healthcare Corp., 533

F.3d 381, 402 (6th Cir. 2008) (quoting Tuttle v. Metro. Gov't of Nashville, 474 F.3d 307, 322

(6th Cir. 2007)).  "Thus, to characterize a negative performance evaluation as an adverse

employment action 'the plaintiff must point to a tangible employment action that she alleges

she suffered, or is in jeopardy of suffering, because of the downgraded evaluation.'"  White,

533 F.3d at 402 (quoting Morris v. Oldham County Fiscal Court, 201 F.3d 784, 789 (6th Cir.

2000)).

Moreover, as stated by the Supreme Court, "reassignment of job duties is not

automatically actionable.  Whether a particular reassignment is materially adverse depends

upon the circumstances of the particular case, and should be judged from the perspective

of a reasonable person in the plaintiff's position, considering all the circumstances."  White,

548 U.S. at 71 (quoting cases).  The Court in White determined that a jury might

reasonably conclude that reassignment to a less prestigious, "more arduous and dirtier" job

qualifies as a materially adverse action notwithstanding the fact that "the former and

14

present duties fall within the same job description." Id. However, "[r]eassignments without changes in salary, benefits, title, or work hours usually do not constitute adverse employment actions." Policastro v. Northwest Airlines, Inc., 297 F.3d 535, 539 (6th Cir. 2002). See also Freeman v. Potter, 200 Fed. App'x 439, 443 (6th Cir. 2006) (unpublished) ("[i]n general, a lateral transfer . . . is not a materially adverse action").

In determining whether an employer's actions are "materially adverse," the Supreme Court has instructed that "it is important to separate significant from trivial harms." White, 548 U.S. at 68. "An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." Id. Therefore, "[t]he Sixth Circuit has consistently held that de minimis  employment actions are not materially adverse and, thus, not actionable." Bowman v. Shawnee State Univ., 220 F.3d 456, 462 (6th Cir. 2000).  For example, "isolated incidents of childishness" such as "rude" gestures (e.g., "giving the finger") and comments (e.g., "up yours") are not actionable. Poppy v. City of Willoughby Hills, 96 Fed. App'x 292, 296 (6th Cir. 2004) (unpublished).

Actions which cause a "bruised ego" are also not actionable. See Ellerth, 524 U.S. at 761 (citing Flaherty v. Gas Research Institute, 31 F.3d 451, 456 (7th Cir. 1994)); Freeman, 200 Fed. App'x at 442. Nor is "reassignment to more inconvenient job." See Ellerth, 524 U.S. at 761 (citing Harlston v. McDonnell Douglas Corp., 37 F.3d 379, 382 (8th Cir. 1994)).   Put differently, "[t]he action 'must be more disruptive than a mere inconvenience or an alteration of job responsibilities.'" Freeman, 200 Fed. App'x at 442 (quoting Kocsis v. Multi-Care Mgmt., Inc., 97 F.3d 876, 886 (6th Cir. 1996)).  See also Brennan v. Tractor Supply Co., 237 Fed. App'x 9, 24 (6th Cir. 2007) (unpublished) (no

15

materially adverse employment action where the only adverse aspect of the reassignment was the requirement that the plaintiff "report to a younger man"); Flaherty, 31 F.3d at 456 (a semantic change in title and a "bruised ego" were not enough to establish an adverse employment action, especially where plaintiff's pay remained the same). However, it must be remembered that

> an employee need not have suffered one of the "ultimate employment actions" . . . (e.g., termination, demotion, failure to promote, etc.) to have a viable claim of discrimination. A material adverse action may consist of a less distinguished title, diminished options for advancement, or other unique indices. Importantly, however, an individual's "subjective impression concerning the desirability of one position over another" is insufficient to render an employer's action materially adverse.

Freeman, 200 Fed. App'x at 442 (citations omitted).

Additionally, the Supreme Court has said that "[c]ontext matters" in determining whether an employment action is materially adverse. See White, 548 U.S. at 69. For example,

> [a] schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school age children. A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination.

Id. (citation omitted).

### 5. Discussion

### a. The Transfers

The Court agrees with Defendants and finds that the two transfers do not constitute adverse employment actions as a matter of law. First, Flynn concedes that he suffered no

reduction in salary or benefits as a result of the transfers.  See Flynn Dep. at pp. 114-115. In addition, Flynn's hours stayed the same after each reassignment, see Defs.' Reply at Exs. A and B, and Flynn has not alleged any change to a less distinguished job title following the transfers.  Therefore, because neither transfer involved a reduction in salary or benefits, a less distinguished job title, or changed hours, the transfers here are not of the type typically qualifying as "materially adverse" employment actions under the prevailing law.  See Policastro, 297 F.3d at 539 ("[r]eassignments without changes in salary, benefits, title, or work hours usually do not constitute adverse employment actions").

In addition, although Flynn testified that the transfers were "humiliation tactics," he points to no evidence that the transfers involved anything more than a bruised ego, which is not actionable.  See Ellerth, 524 U.S. at 761; Freeman, 200 Fed. App'x at 442.  For example, the record contains no evidence, nor does Flynn claim, that the transfers negatively affected his career advancement opportunities or involved a change in job responsibilities.  In White, the sole case on which Flynn relies in support of his argument that the transfers qualified as adverse employment actions, the plaintiff was reassigned from a forklift operator to standard truck laborer tasks.  See 548 U.S. at 70.  The latter duties were "more arduous and dirtier" and the job less prestigious.  See id. at 71.  White and the present case are distinguishable because White involved a materially adverse change in job duties while the present case does not.  Flynn points to no evidence that his job duties changed following the transfers.  He states only that he was humiliated.  Under these circumstances, then, White is not applicable.  Neither a bruised ego nor Flynn's "subjective impression concerning the desirably of one position over another" is sufficient "to render an employer's action materially adverse."  See Freeman, 200 Fed. App'x at 442.

17

Finally, as noted above, "[c]ontext matters" in determining whether an employment action is materially adverse. See White, 548 U.S. at 69. Here, the context surrounding Flynn's transfers supports the Court's conclusion that Flynn did not suffer a materially adverse employment action. First, as Defendants point out, Flynn was one of dozens of deputies to receive new assignments effective August 21, 2004, and September 18, 2004. Specifically, 22 and 39 other deputies were reassigned, in addition to Flynn, effective August 21, 2004, and September 18, 2004, respectively. See Defs.' Reply at Exs. A and B. Flynn fails to explain what sets his transfers apart from the numerous others occurring contemporaneously.[6]

Second, Flynn contends that his transfer from Complex CRT to Lyon Contract was humiliating because "they put [him] with [Deputy] Bay," who "doesn't like anyone who reports thing[s] to bosses." Flynn Dep. at pp. 117-188. However, Flynn testified that he "got along fine" with Deputy Bay at the time. See id. Therefore, the entire premise underlying Flynn's claim that his transfer to Lyon Contract was retaliatory is flawed.

### b.  The Denial of Promotional Opportunities and Overtime

Flynn has not even attempted to demonstrate that he was passed over for a promotion or denied overtime opportunities. In order to sustain the former claim, Flynn must show that

> [he] is a member of a protected class; (2) [he] applied for and was qualified for a promotion; (3) [he] was considered for and was denied the promotion; and (4) an individual of similar qualifications who was not a member of the protected class received the job at the time

---

[6] Although no other deputies were transferred with Flynn to Complex CRT effective August 21, 2004, three deputies were transferred to Complex CRT effective September 18, 2004. Moreover, two other deputies, in addition to Flynn, were transferred to Lyon Contract effective September 18, 2004.

plaintiff's request for the promotion was denied.

White, 429 F.3d at 240.  Flynn does not acknowledge this four-part inquiry, much less offer evidence relating to elements (2), (3), or (4).  The fact that Captain Molinar said in his deposition that he would not recommend Flynn for a promotion is irrelevant given that Flynn has failed to establish that the Oakland County was seeking applications for an open position or that he applied.

Moreover, the record contains no evidence that Flynn was denied overtime opportunities.  Flynn dedicates one sentence to this claim in his brief and entirely fails to offer evidence sufficient to meet his burden on summary judgment.  For example, Flynn has not offered evidence or even alleged that similarly situated employees were given overtime opportunities that he was denied or unable to perform, nor has he offered any details regarding any particular opportunity on which he missed out.  This level of specificity is necessary at this stage of the proceedings so that the Court can evaluate Flynn's claim.  See generally Broska, 70 Fed. App'x at 268 (granting summary judgment in the defendant's favor where the plaintiff had "put forth virtually no evidence on the overtime issue," such as "evidence showing that he has been denied overtime opportunities that others have received" or "how much overtime he lost due to the retaliation"); Hubbard v. Port Authority of N.Y. and N.J., No. 05 Civ. 4396, 2008 WL 464694, at *12 (S.D.N.Y. Feb. 20, 2008) (granting summary judgment against the plaintiffs where they failed to offer "'affirmative and specific' supporting evidence that Plaintiffs were actually denied overtime"); Taylor v. Potter, No. 99 Civ. 4941, 2004 WL 1811423, at *23 (S.D.N.Y. Aug. 16, 2004) (rejecting denial of overtime claim where there was "no evidence that [the plaintiff] was offered fewer opportunities to work overtime . . . or was offered fewer opportunities than other similarly

19

situated employees").

### c. The Negative Performance Evaluation

Flynn has not met his burden of demonstrating that the evaluation constitutes an adverse employment action. In order to make this showing, Flynn was required to offer evidence that "the evaluation ha[d] an adverse impact on [his] wages or salary." See White, 533 F.3d at 402. Because Flynn has not "point[ed] to a tangible employment action" that he suffered or "is in jeopardy of suffering" because of the evaluation, id. at 402, his claim that the evaluation constitutes adverse employment action fails.[7]

Finally, in the portion of his brief discussing adverse employment actions, Flynn mentions the following incidents, all of which occurred while Flynn was stationed at Lyon Contract: (1) Sergeant Crocket "announced to the deputies that they did not have to 'break bread' with [Flynn]"; (2) Someone placed a "Trust No One" sticker on Flynn's car and a "Who's a Rat" printout in Flynn's employee mailbox; (3) Flynn's work locker was broken into and personal items taken; and (4) Deputy Bay verbally assaulted Flynn and failed to back him up in a timely manner.

To the extent Flynn argues that these incidents qualify as adverse employment

---

[7] The Court notes that Dzierbicki, the sole case on which Flynn relies for the proposition that a negative performance evaluation constitutes adverse employment action, does not stand for the cited proposition. No where in Dzierbicki does the court discuss what is and what is not deemed an adverse employment action. In fact, other than noting the general existence of the adverse action requirement in First Amendment retaliation cases, the only mention of an adverse employment action in Dzierbicki is the court's acknowledgment of the plaintiff's argument: "Plaintiff argues that the adverse actions taken against him based on his speech include a six-week suspension without pay imposed in April 2006, a four-day suspension without pay imposed in January 2007, and negative bi-annual performance evaluations throughout the time period." Dzierbicki, No. 07-13109, at 14. The Court agrees with Defendants that Flynn's "attempt to rely on Dzierbicki to support the idea that negative performance evaluations qualify as adverse employment actions is [without merit]."

actions, the Court disagrees for the following reasons.  With regard to (1), Sergeant Crocket is not a defendant.  With regard to (2), "isolated incidents of childishness" such as "rude" gestures (e.g., "giving the finger") and comments (e.g., "up yours") are not actionable.  Poppy, 96 Fed. App'x at 296.  With regard to (2) and (3), Flynn has not offered any evidence as to who is responsible for these acts.  With regard to (4), Flynn has not asserted a First Amendment retaliation claim against Deputy Bay and, even if he had, Deputy Bay was Flynn's co-worker and not a final decision-maker or "influential recommender" and therefore lacked the requisite level of decision-making authority to be held liable on a First Amendment retaliation claim.  See Ward v. Athens City Bd. of Educ., No. 97-5967, 1999 WL 623730, at *8 (6th Cir. 1999) (unpublished) ("[a]s shown by such cases as Adkins [v. Bd. of Educ. of Magoffin County, Ky., 982 F.2d 952 (6th Cir.1993)], an influential recommender can be liable under § 1983 without being the final decisionmaker, if the recommendations are shown to be sufficiently influential").  Finally, with regard to (1) – (4), "the First Amendment . . . does not empower [a public employee] to 'constitutionalize the employee grievance.'"  Garcetti v. Ceballos, 547 U.S. 410, 420 (2006) (quoting Connick v. Myers, 461 U.S. 138, 154 (1983)).

### B.  Count IV: Flynn's Municipal Liability Claims

### 1.

Flynn says that Defendants Oakland County, Bouchard, and McCabe[8] are liable under 42 U.S.C. § 1983 because they: (1) "retaliat[ed] against employees who report the

---

[8] According to Flynn's Second Amended Complaint, Defendant McCabe is the Under Sheriff of Oakland County.  (See SAC at ¶ 5.)  As such, Flynn improperly directs his municipal liability claim against him.  See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978) (holding that "a municipality cannot be held liable under § 1983 on a respondeat superior theory").

immoral, unethical, and illegal actions of officers," (2) "[took] adverse employment actions against employees who report wrongdoing," (3) "fail[ed] to conduct neutral and unbiased investigations regarding command staff misconduct against fellow officers," (4) "intentionally disclos[ed] the identities of employees who report unethical, immoral, and/or illegal conduct, and/or employees who report violations of Oakland County policies," (5) "fail[ed] to adequately train and/or supervise employees . . . regarding the proper investigation of unethical, illegal, or immoral conduct of officers," (6) "fail[ed] to train and/or supervise employees . . . as to interviewing witnesses during an internal investigation," (7) "ignor[ed] complaints which have been made with respect to unethical and illegal behavior of officers," and (8) "fail[ed] to promptly discipline officers for engaging in immoral, unethical, and/or illegal actions."  (See SAC at ¶ 120.)

### 2.

Three rules govern a municipality liability claim.  First, "a municipality cannot be held liable [under § 1983] solely because it employs a tortfeasor–or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory."  Monell, 436 U.S. at 691.  Second, "[a] local government entity violates § 1983 where its official policy or custom actually serves to deprive an individual of his or her constitutional rights."  Gregory v. City of Louisville, 444 F.3d 725, 752 (6th Cir. 2006).  Third, "[t]he burden of proof is on the plaintiff to set forth the unconstitutional policy and link it with both the municipality and the injuries at issue."  King v. City of Eastpointe, 86 Fed. App'x 790, 801 (6th Cir. 2003).

### 3.

With regard to theories (1) and (2), as enumerated in Part 1 above, even assuming

22

without finding that Oakland County has an official policy or custom of retaliating and taking adverse employment action against employees who report wrongdoing, Flynn cannot show that the policy or custom "actually serve[d] to deprive [him] of his . . . constitutional rights." See Gregory, 444 F.3d at 752. This is because the Court has already determined that his retaliation-inducing speech did not result in adverse employment action and that Flynn's retaliation claim is not viable. Even assuming the truth of the allegations made by Flynn in theories (1) and (2), then, Flynn cannot show that any policy or custom actually deprived him of his constitutional rights. See id. Therefore, theories (1) and (2) are not cognizable.

**4.**

Flynn argues in support of theory (3) that Oakland County "fail[ed] to conduct neutral and unbiased investigations regarding command staff misconduct against fellow officers." (See SAC at ¶ 120h.) However, even assuming this is true, Flynn has not linked any failure to conduct a proper investigation to an injury of constitutional import. In other words, even assuming arguendo that Oakland County failed to conduct a proper investigation into any alleged misconduct by other officers in this case, or that it has a policy or custom of failing to investigate in general, Flynn has not met his burden of linking the unconstitutional policy or custom to any injuries he suffered. See King, 86 Fed. App'x at 801.

**5.**

With regard to theory (4), Flynn has not shown or even suggested that he has a constitutional right to lodge complaints anonymously. Thus, assuming arguendo that Oakland County has an official policy or custom of "intentionally disclosing the identities of employees who report unethical, immoral, and/or illegal conduct, and/or employees who report violations of Oakland County policies," see SAC at ¶120e, Flynn has not carried his

23

burden of "set[ting] forth [an] unconstitutional policy . . ." see King, 86 Fed. App'x at 801. Theory (4) is therefore not cognizable.

**6.**

Flynn's failure to train claims – theories (5) and (6) – are also not cognizable because he does not discuss these claims and the applicable law in his brief.

**7.**

With regard to theories (7) and (8), Flynn says that Oakland County failed to discipline its officers. These claims are unavailing for three reasons. First, Flynn has not shown, as he must, "the existence of a clear and persistent pattern" by Oakland County of a failure to discipline its deputies. See Doe v. Claiborne County, Tenn., 103 F.3d 495, 508 (6th Cir. 1996). See also Berry v. City of Detroit, 25 F.3d 1342, 1354 (6th Cir. 1994) ("[i]n the failure to discipline context, it is appropriate to apply the deliberate indifference standard adopted by the Supreme Court in City of Canton v. Harris, to require a showing of a history of widespread abuse that has been ignored by the City" (citation omitted)). Any failure to discipline based on conduct relating to this case alone is not evidence of a "clear and persistent pattern." See Doe, 103 F.3d at 508.

Additionally, Flynn admits that his various complaints were investigated, see Flynn Dep. at pp. 123-124, 127-128, 133-135, 135, 142, and the evidence submitted by Oakland County demonstrates that written reports detailing the findings of three investigations were prepared by Flynn's superiors, see Defs.' Exs. I, J, K. Therefore, Flynn has not shown "a history of widespread abuse that has been ignored." See Berry, 25 F.3d at 1354.

Third, Flynn's failure to discipline claims fail because, even assuming the truth of the claims, Flynn has not explained how he has been injured by any failure of Oakland County

24

to discipline its officers.  See King, 86 Fed. App'x at 801.

Finally, insofar as Flynn says that Oakland County failed to discipline Deputy Sherman for his alleged conduct at the Elephant Bar, that claim is unavailing because Deputy Sherman was disciplined for his conduct.[9]

## V.  Conclusion

For the reasons stated above, Defendants' Motion for Summary Judgment is GRANTED and the case is DISMISSED.  Whatever the mistreatment of Flynn in his workplace situation, it did not rise to the level of a constitutional violation.

Flynn's Motion for Leave to File Third Amended Complaint is DENIED as moot without prejudice to his right to file it as an independent action.

SO ORDERED.


Dated:  July 9, 2009                      s/ Avern Cohn
                                         AVERN COHN
                                         UNITED STATES DISTRICT JUDGE


I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, July 9, 2009, by electronic and/or ordinary mail.

                                          s/ Julie Owens
                                         Case Manager, (313) 234-5160

---

[9] Defendants state in their brief that Deputy Sherman was disciplined for his conduct at the Elephant Bar.  (See Defs.' Mot. for Summ. J. at 2, 17.)  Flynn offers no evidence to the contrary.